# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JIANPING SUN, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Civil Action No. 07-0504 (JDB) |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## FEDERAL RESPONDENTS' MOTION TO DISMISS

Federal Respondents, by and through their attorney, the United States Attorney for the District of Columbia, respectfully move this Court to dismiss this case, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction, and for failure to state a claim upon which relief can be granted. This motion is based on the accompanying Memorandum of Points and Authorities, supporting Declarations of the Federal Bureau of Investigation ("FBI") and the United States Citizenship and Immigration Services ("USCIS"), and the attached Exhibit: United States Citizenship and Immigration Services ("USCIS or CIS") Fact Sheet, "Immigration Security Checks – How and Why the Process Works." A proposed Order is also attached.

Respectfully submitted,

Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

s/Sherease Louis
SHEREASE LOUIS
Special Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JIANPING SUN, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Civil Action No. 07-0504 (JDB) |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS

Federal Respondents, United States Department of Justice ("DOJ"), United States

Citizenship and Immigration Services ("USCIS"), United States Department of Homeland

Security ("DHS"), and Federal Bureau of Investigation ("FBI"), respectfully move to dismiss the

Petition for Mandamus filed by the Petitioner in the above-captioned matter, pursuant to Fed. R.

Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction, and for failure to state a

claim upon which relief can be granted.

STATEMENT OF FACTS

Petitioner Jianping Sun, a native and citizen of China, filed a Petition seeking to compel

Respondents to take action on a pending I-485 Application to Register Permanent Resident or

Adjust Status.  Petition ¶ 1, 9.  Petitioner filed Forms I-485, Application to Adjust Status to

Permanent Resident, in April 2004.  *Id.*  Petitioner also filed a visa petition (Form I-140) with

USCIS on April 24, 2004, which was approved on February 22, 2005. ¶ 9.  Petitioner's

fingerprints were submitted on April 14, 2005.  Pet. ¶ 9.  The name check for Petitioner has not

been completed and remains pending.  Cannon Decl. ¶ 22.  Petitioners' national security

background investigation is ongoing and has not yet been completed.  Puripongs Decl. ¶ 8-9.

Once the national security background investigation is completed, Petitioner's application will be adjudicated. *Id.* at 2-3.

## ISSUE PRESENTED

The issue presented in this suit is whether an applicant for adjustment of status to that of a permanent resident of the United States, whose security check is pending, has presented this Court with a justiciable action such that a Court may order mandamus relief. Given that the adjustment of status process is committed to the sole discretion of the Attorney General, this Court has no jurisdiction over the issue.[1] This Court should therefore dismiss the Petition for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## I.     THE ADJUSTMENT OF STATUS APPLICATION PROCESS

In earlier times, an alien who sought legal permanent resident status in this country did so by applying to the consulate in his native country. *See Elkins v. Moreno*, 435 U.S. 647, 667 (1978). As a convenience to the alien, Congress permitted the alien to avoid a costly trip out of

---

[1]     Courts presented with the issue of whether they have jurisdiction to compel the completion of a national security screening of a visa petitioner, beneficiary, or adjustment applicant, have nearly unanimously determined that they do not. *See Wan Shih Hsieh v. Kiley*, 569 F.2d 1179 (2nd Cir., 1978); *Ousama M. Ben Khalifa and Lisa M. Ben Khalifa v. USCIS,* 2006 WL 3608825, No. 6:06-cv-620-Orl-31JGG (M.D. Fla., October 10, 2006); *Dinsey v. DHS,* USCIS, 2004 WL 1698630 (S.D.N.Y. 2004.); *Mustafa v. Pasquerell,* 2006 WL 488399 (W.D.Tex. January 10, 2006); *Safadi v. Howard*, 466 F. Supp.2d 696 (E.D.Va. Dec 20, 2006); *Mohamed Zahani v. DHS*, 2006 WL2246211 (M.D.Fla. June 26, 2006); *Gemini Realty, Inc. v. Gonzalez*, 2006 WL 3039012 (M.D.Fla. Oct 12, 2006); *Chaudry v. DHS*, 2006 WL 2670051 (D. Minn. 2006); *Zheng v. Reno*, 166 F. Supp.2d 875 (S.D.N.Y., 2001); *Keane v. Chertoff,* 419 F. Supp. 2d 597 (S.D.N.Y., 2006); *Alkenani v. Barrows*, 356 F. Supp.2d 652 (N.D. Tex., Feb 14, 2005); *Reyes v. U.S. I.N.S.*, 229 F.3d 1136, 2000 WL 1459029 (2nd Cir., 2000). Cf. *Kenny v. Smith*, 2005 WL 2885483 (9th Cir., Nov 03, 2005); *Alvidres-Reyes v. Reno*, 180 F.3d 199 (5th Cir. ,1999); 8 C.F.R. § 103.2 (b)(7) & (18); *Cordoba v. McElroy*, 78 F. Supp.2d 240 (S.D.N.Y. 2000); *Espin v. Gantner*, 381 F. Supp.2d 261, 264 (S.D.N.Y. Jul 19, 2005); *Grinberg v. Swacina*, 478 F. Supp. 2d 1350 (S.D.Fla. Mar 20, 2007).

the country to obtain a visa, and created the adjustment of status process permitting the alien to file without leaving the country. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976). While the alien physically stands inside the United States, legally, he stands in his native country and the Attorney General acts as the consulate. *See Choe v. INS*, 11 F.3d 925, (9th Cir. 1993). Adjustment of status is a matter of grace. *See Elkins*, 435 U.S. at 667. The alien, at all times, bears the burden of proof, to persuade the Attorney General to grace the applicant in his discretion with the privilege of lawful permanent residence status. *Id.*

The Attorney General has exclusive jurisdiction to adjust the status of certain aliens. 8 U.S.C. § 1255 exclusively authorizes the Attorney General to adjust to lawful permanent residence status certain aliens who have been admitted into the United States. This adjustment of status is expressly and solely committed to the Attorney General's discretion. Section 1255(a) provides:

> The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time of his application.

8 U.S.C. § 1255(a) (emphasis added).

Not only does the statute vest the Attorney General with exclusive and discretionary authority, it also does not place any time restriction upon the Attorney General. The federal regulations governing adjustment of status, 8 C.F.R. § 245.1 *et seq.*, also do not place any time restrictions upon the Attorney General. Generally, the Attorney General may direct any necessary investigation of an applicant. See 8 C.F.R. § 103.2(b)(7). Further, the Attorney

General may withhold an adjudication pending completion of the investigation.  *See* 8 C.F.R. § 103.2(b)(18).

In 1994, Congress enacted 108 Stat. 1725, 1766, Pub. L. 103-317, § 506(d), which provides that "[t]he Immigration and Naturalization Service shall conduct full fingerprint identification checks through the Federal Bureau of Investigation for all individuals over sixteen years of age adjusting immigration status in the United States pursuant to this section."  Shortly after September 11, 2001, USCIS and the FBI responded to even greater national security concerns, and provided for a more stringent security check review.  Cannon Decl. ¶¶ 16, 17, 18.  These agencies have expanded the scope of the background screenings, from ordinary criminal background investigations to matters of national security.  Cannon Decl. ¶ 17; *see generally* Immigration Fact Sheet.   After an alien submits an adjustment application (Form I-485), USCIS, in conjunction with the FBI, conducts several forms of security checks to ensure that the alien is eligible for the benefit and that he is not a risk to national security or public safety.  *Id.*; Puripongs Decl. ¶ 2.  These checks currently include: 1) a FBI fingerprint check for relevant criminal history records on the alien; 2) an FBI name check, that is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check.  Puripong Decl. ¶ 4.  *See* 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States").

## II.    STANDARD OF REVIEW

### A.    The Legal Standard for a Motion to Dismiss under Rule 12(b)(1)

Under the Federal Rules of Civil Procedure, a Respondent may move to dismiss for lack of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1).  Subject matter jurisdiction cannot be conferred by the parties, nor can a defect in subject matter jurisdiction be waived by the parties. *See United States v. Cotton*, 535 U.S. 625, 630 (2002).  Under Rule 12(b)(1), a plaintiff squarely bears the burden to establish subject matter jurisdiction, especially against the United States.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994); Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 432 (1990); *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  The scope of Rule 12(b)(1) is flexible and can serve as a procedural tool for raising a variety of challenges such as a failure to exhaust administrative remedies and ripeness. *See United States v. Lahey Clinic Hosp.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005).  The Court may not presume the truthfulness of Petitioners' allegations regarding subject matter jurisdiction, but must evaluate for itself the merits of the jurisdictional claims.  *Id.*  In review of a Rule 12(b)(1) motion, this Court may consider matters outside of the pleadings without converting the motion to summary judgment, and no presumptive truthfulness attaches to the allegations of the Petition. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

### B.    The Legal Standard for a Motion to Dismiss under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In making determinations on a motion to dismiss under Rule 12(b)(6), a court must view facts alleged in the Petition in the light most favorable to the Petitioner.  *Id.; see also Nix v. Hoke*, 139 F.Supp.2d 125, 131 (D.D.C.

April 2001) (citing, *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)), and

*Slaby v. Fairbridge*, 3 F. Supp. 2d 22, 27 (D.D.C. 1998).  In this case, Petitioner fails to establish

a right to relief on the claims asserted, even when accepting the facts he alleges as true.

## ARGUMENT

I.    **The Adjustment Statutes Vest the Attorney General with Sole Discretionary Authority and Bar Judicial Review.**

The adjustment of status application process is expressly committed to the sole discretion

of the Attorney General.  See 8 U.S.C. § 1255(a).  Section 1255(a) provides:

> The status of an alien who was inspected and admitted or paroled into the United
> States ... may be adjusted by the Attorney General, in his discretion and under
> such regulations as he may prescribe, to that of an alien lawfully admitted for
> permanent residence if (1) the alien makes an application for such adjustment, (2)
> the alien is eligible to receive an immigrant visa and is admissible to the United
> States for permanent residence, and (3) an immigrant visa is immediately
> available to him at the time of his application.

8 U.S.C. § 1255(a) (emphasis added).  Not only does the statute vest the Attorney General with

exclusive and discretionary authority, it also does not place any time restriction upon the

Attorney General.  The corresponding section of the Code of Federal Regulations that governs

adjustment, 8 C.F.R. § 245.1 et seq., also does not place any time restriction upon the Attorney

General. The Attorney General may direct any necessary investigation of an applicant. See 8

C.F.R. § 103.2(b)(7).  Further, the Attorney General may withhold an adjudication pending

completion of the investigation. See 8 C.F.R. § 103.2(b)(18).  There is no judicial review of that

discretion. See 8 U.S.C. § 1252(a)(2)(B)(ii).  Section 1252(a)(2)(B) provides:

> Notwithstanding any other provision of law (statutory or nonstatutory),
> including....sections 1361 and 1651 of [Title 28], and except as provided in
> subparagraph (D), and regardless of whether the judgment, decision or action is
> made in removal proceedings, no court shall have jurisdiction to review -
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(1),
> 1129b, 1229c, or 1255 of this title, or

6

(ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of [Title 8].

8 U.S.C. § 1252(a)(2)(B). Subsection (i) is inapplicable here because there has not been any "judgment regarding the granting of relief" with respect to Petitioner's applications.  Broadly worded subsection (ii), which applies to "any other decision or action," precludes this Court's review of Petitioners' claims.  *See Safadi v. Howard*, 466 F. Supp.2d 696, 699-700 (E.D.Va. 2006) (no jurisdiction to provide relief under a writ of mandamus or the APA).

Under 8 U.S.C. § 1252(a)(2)(B)(ii), courts are barred from reviewing any "decision or action" (other than asylum determinations) the "authority for which is specified ... to be discretion[ary]" under "this subchapter." *See Safadi*, 466 F. Supp.2d at 700.  "[T]his subchapter" refers to Subchapter 11 of Chapter 12 of Title 8 of the U.S. Code, which is comprised of 8 U.S.C. §§ 1151-1378.  Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications,  is thus part of Subchapter 11.  Under section 1255(a), the "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General." Section 1255(a) provides that an alien's status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe." *Id.*   Clearly, the statute and the regulations provide no time frame for the adjustment process.

With this statutory and regulatory scheme, Congress vested the Attorney General with exclusive discretion over the adjustment process.  This discretion necessarily includes not only discretion whether to confer the "grace" of adjustment, but also discretion over how and when to do so.  As one court recently held,

> "if Congress intended to confer jurisdiction on a federal court to review the pace of adjudication for adjustment of status applications, it would have expressly provided for a time limitation in 8 U.S.C. § 1255(a), as it did in 8 U.S.C. § 1447(b).  Section 1447(b) provides for a 120 day time limit to make a determination on a naturalization application after an examination is conducted. 8 U.S.C. § 1447(b) (2006).  That Congress did not do so here reflects its intent to leave the pace of adjudication discretionary with the United States Attorney General and outside the scope of judicial review.  While this Court acknowledges Plaintiff's frustration from waiting indefinitely in "immigration limbo" for a determination, it finds that Congress, rather than a federal court, is the proper governmental body to fashion a remedy."

*Grinberg v. Swacina,* 478 F. Supp.2d 1350, 1352 (S.D. Fl. 2007).

Likewise, in an analogous case, *Jilin Pharm. USA, Inc. v. Chertoff*, 447 F.3d 196 (3d Cir. 2006), the Third Circuit reasoned that, because the visa revocation statute in question provided the operative words "may" "at any time" and "deem," the statute clearly granted sole discretionary authority in the Secretary of DHS to revoke the approval of any petition approved by him under Section 204.  *Id.* at 203, 205.  As such, the Third Circuit determined that judicial review was barred under § 1252(a)(2)(B)(ii).  *Id.* at 205.  Here, § 1255(a) provides the operative words "may" and "discretion" and "may" in relation to promulgating regulations.  The corresponding regulations, 8 C.F.R. § 245.1 *et seq*., do not set forth any time restriction on the Attorney General.

Thus, it is clear that the Attorney General has sole discretionary authority that is unreviewable under Section 1252(a)(2)(B)(ii).  In seeking to compel the adjudication of an adjustment of status application under 8 U.S.C.  § 1255(a), Petitioner's claims fall squarely within the purview of 8 U.S.C. § 1252(a)(2)(B)(ii) barring judicial review.  *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003).  The USCIS's decision to continue evaluating Petitioner's application, and the action it is taking in doing so, lie within the sole discretionary authority of the Attorney General under section 1255(a).

Moreover, Congress's specific bar of subject matter jurisdiction from this Court defeats Petitioner's assertion of general federal question jurisdiction under 28 U.S.C. § 1331 and mandamus jurisdiction under 28 U.S.C. § 1361. *See Safadi v. Howard*, 466 F. Supp.2d at 700; *Danilov v. Aguirre*, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction."). Indeed, section 1252(a)(2)(B) expressly states that it applies "notwithstanding... [28 U.S.C.] § 1361," and the APA explicitly provides that it does not apply where "statutes preclude judicial review." See 5 U.S.C. § 701(a)(2). This Court should therefore dismiss the Petition for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II. Mandamus May Not Issue Here Because the Petitioner Lacks a Clear Right to an Immediate Adjudication.

The common law writ of mandamus, as codified in 28 U.S.C. § 1361, is a drastic and discretionary remedy provided in extraordinary situations to relieve a clearly deserving Plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty. *See Kerr v. U.S. Dist. Ct. for N.D. Cal.*, 426 U.S. 394, 402-403 (1976). Issuance of a writ of mandamus is a drastic remedy to be invoked only in extraordinary situations. *See Chatman-Bey v. Thornburgh*, 864 F.2d 804, 806 n. 2 (D.C. Cir. 1988). It is granted only when essential to the interests of justice. *See Starnes v. McGuire*, 512 F.2d 918, 929 (D.C. Cir. 1974)(en banc); *Haneke v. Secretary of HEW*, 535 F.2d 1291, 1296 (D.C. Cir. 1976); *In Re Tripati*, 836 F.2d 1406, 1407 (D.C. Cir. 1988).

While a federal district court has authority to issue a writ of mandamus pursuant to 28 U.S.C. § 1361, its issuance is not required; rather, mandamus is issued at the discretion of the

Court.  *National Wildlife Federation v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980).  It may

only issue if three elements are met: 1) the petitioner has shown a clear and indisputable right to

the relief sought; 2) the respondent has a clear nondiscretionary duty to do the particular act

requested by the petitioner; and 3) no other adequate remedy is available. *See In re Diet Drugs*,

418 F.3d 372, 378-79 (3d Cir. 2005) (Alito, J.).

It is clear that the requirement of a duty to act has been interpreted to mean that the duty of

the federal officer sued must be "ministerial, plainly defined and peremptory." *Jeno's Inc. v.

Commissioner of Patents and Trademarks*, 498 F. Supp. 472, 476 (D. Minn. 1980).  The act

sought to be compelled must be "a clear nondiscretionary duty."  *Pittston Coal Group v. Sebben*,

109 S. Ct. 414, 424 (1988).  *Accord, Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179 (9th Cir. 1983);

*Welch v. Donovan*, 551 F. Supp. 809 (D.D.C. 1982).  "It is well settled that a writ of mandamus is

not available to compel discretionary acts."  *Cox v. Secretary of Labor*, 739 F. Supp. 28, 30

(D.D.C. 1990)(citations omitted).

For these reasons, district courts have routinely found that mandamus relief is unavailable

to compel immediate adjudication of applications for adjustment of status. *See, e.g., Li v. Chertoff

et al.*, 2007 U.S. Dist. LEXIS 29766 (April 2, 2007)(motion to dismiss granted based upon lack of

subject matter jurisdiction in mandamus action regarding delayed adjudication of I-485

application); *Safadi v. Howard*, 466 F. Supp. 2d 696, 698-700 (E.D. Va. 2006)(finding no

jurisdiction to review discretionary pace of adjustment application adjudications); *Zheng v. Reno*,

166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001)("[m]atters within the INS's discretion are not

reviewable under the mandamus statute"); *Zaytsev v. Gantner et al.*, 2004 U.S.Dist. LEXIS 28632

(S.D.N.Y. 2004)(denial of mandamus relief to expedite adjudication); *Keane v. Chertoff*, 419 F.

Supp.2d 597, 599-600 *(S.D.N.Y. 2006); Saleh v. Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005);*

*Karan* v. McElroy, 2003 WL 21209769, at * 1 (S.D.N.Y.2003); *Zheng v. Reno*, 166 F. Supp. 2d

875, 880-81 (S.D.N.Y. 2001); *Sadowski v. INS*, 107 F. Supp.2d 451, 453 (S.D.N.Y. 2000);

*Rahman v. McElroy*, 884 F. Supp. 782, 787 (S.D.N.Y. 1995); *Serrano v. Quarantillo,* 2007 WL

1101434 at *2-4 (D.N.J. Apr.9, 2007) (unpub. Op.)(Debevoise,J).

Here, Petitioner has not demonstrated that he has a clear right to an immediate

adjudication, and Respondents owe no clear duty to adjudicate Petitioner's application prior to the

completion of the national security screening.  Thus, because there is no clear right in the

Petitioner to the relief sought, and no plainly defined and nondiscretionary duty on the part of the

Respondents to honor that right, Petitioner has failed to demonstrate that he is entitled to

mandamus relief.  *Northern States Power Co. V. U.S. Dep't of* Energy, 128 F.3d 754, 758

(D.C.Cir. 1997); *Ganem v. Heckler*, 746 F.2d 844, 852 (D.C. Cir. 1984); *accord In Re Lane*, 801

F.2d 1040, 1042 (8th Cir. 1986); *Homewood Professional Care Center, Ltd. v. Heckler*, 764 F.2d

1242, 1251 (7th Cir. 1985); *Jones v. Alexander*, 609 F.2d 778 (5th Cir. 1980); *Billiteri v. U.S.*

*Board of Parole*, 541 F.2d 938 (2nd Cir. 1976).

## III.    There is No Jurisdiction Under the APA

The APA does not entitle a person "adversely affected or aggrieved by agency action" to

judicial review where another statute precludes judicial review or "*agency action is committed to*

*agency discretion by law." See 5 U.S.C. § 701(a)(2); Brock v. Pierce County*, 476 U.S. 253, 260

n.7 (1986).  Section 701(a)(2) precludes judicial review over Petitioner's claims because the

adjudication of adjustment of status applications is committed to agency discretion.  This Court

should therefore deny Petitioner's claims.

The APA itself does not confer jurisdiction on a district court to review the decision of an

administrative agency. *See Califano v. Sanders*, 430 U.S. 99, 107 (1977).  However, a district

court may have subject matter jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has violated the APA if the claim is not "wholly insubstantial and frivolous" or "patently without merit." *See Bell v. Hood*, 327 U.S. 678, 682-84 (1946).  Even where subject matter jurisdiction to review an APA claim exists, however, a claim nevertheless may not be reviewed by the courts if the relevant agency action is "committed to agency discretion by law."  *See* 5 U.S.C. § 701(a)(2). "Agency action" is defined under the APA to include a "failure to act."  *See* 5 U.S.C. § 551(13).

In *Heckler v. Chaney*, 470 U.S. 821 (1985), the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id*. at 830.  As the Court went onto explain, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" Id. (emphasis added); *see also Jilin Pharm. USA*, Inc., 447 F.3d at 204-05.  In addition, at least two Supreme Court cases suggest the importance of a specified time period in allowing a court to compel agency action that is "unreasonably delayed" under section 706(1). *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004).

As explained above, the adjudication of adjustment of status applications is expressly committed to agency discretion. See 8 U.S.C. § 1255(a). Moreover, no statutory or regulatory provisions provide a "meaningful standard" against which to measure the Attorney General's process of adjudicating such an application.  *See Heckler*, 470 U.S. at 830. Rather, the agency maintains complete discretion to determine not only whether to adjudicate the application, but also when to do so.  *Id.*  The statute and regulations governing Petitioner's adjustment of status applications provide no time frame for when such  applications must be adjudicated.  *See Zheng*, 166 F. Supp. 2d at 879 ("[T]here is no requirement that the application be decided within a

specific period of time[.]"). Consequently, there is no standard against which the Court can measure whether the Agency has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication. See 5 U.S.C. § 706(1).  For these reasons, other courts have found that claims relating to alleged delays in the process of adjudicating an adjustment of status application are unreviewable under the APA.  *See Zheng*, 166 F. Supp.2d at 878-89; *Karan*, 2003 WL 21209769, at *1 (S.D.N.Y. 2003) ("[B]ecause decisions regarding the plaintiffs immigration status are committed to the discretion of the INS, this Court lacks the authority under...the APA to grant the relief the plaintiff seeks."); *Rahman v. McElroy*, 884 F. Supp. 782, 787-88 (S.D.N.Y. 1995).  Moreover, as other courts have cautioned, in "matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies." *See Rahman*, 884 F. Supp. at 787 (internal quotes omitted); *see also Heckler*, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"). Accordingly, the Court should find that 5 U.S.C. § 701(a)(2) precludes review of the agency's adjudicative process because it is committed to agency discretion by law.

## IV.     Even Assuming Reviewability, Petitioner's Claim is Unripe.

The United States Constitution limits federal jurisdiction to cases and controversies. *See U.S. Const.*, art. III, § 2, ¶ 1.  As a threshold matter, this Court must bear in mind the doctrine of ripeness, which acts as a safeguard against premature judicial adjudications until an administrative decision has been formalized.  *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  This doctrine is particularly applicable to the USCIS and FBI in the context of national security screenings.

The Supreme Court has recognized that given the national security and international relations aspects of immigration, judicial deference to the Executive Branch is especially appropriate. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999). Judicial review of immigration matters is narrowly circumscribed. *See e.g., Reno v. Flores*, 507 U.S. 292 (1993). Arguably, the governmental interest in the expeditious and economical operation of the immigration laws outweighs those of aliens seeking to benefit from an enumerated discretionary decision from DHS. Therefore, absent constitutional constraints or compelling circumstances, an agency must be permitted to fashion its own procedures to optimize its resources to most effectively discharge its multitude of administrative responsibilities. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978).

Petitioner has the burden to prove subject matter jurisdiction and, in the context of ripeness, must prove the fitness of the issue for judicial decision and the hardship of withholding the Court's consideration. *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808. The Supreme Court previously set forth five factors in these two regards: 1) whether the decision is the agency's definitive position; 2) whether the decision has the status of law; 3) whether the decision has an immediate impact on the day-to-day operations of the party seeking review; 4) whether the decision is a purely legal question that does not require further fact development; and 5) whether immediate judicial review would speed enforcement. *See FTC v. Standard Oil*, 449 U.S. 232, 239-40 (1980).

Respondents have not completed Petitioner's security screening process, due in part to the sheer volume of pending name check applications. Cannon Decl. ¶¶ 13-20. Respondents cannot reshuffle the applicants from those who were first in line to the agencies, to those first in line to the Courts. The Petitioner has the benefit of being permitted to remain inside the United States

14

while the national security screening process is conducted.  While 68% of name checks that are

submitted are processed by the FBI within  48-72 hours, the Petitioner's application,

sympathetically, does not fall within that category.  Cannon Dec. ¶¶ 13, 22.  Thus Petitioner, like

thousands of other applicants in his company, must exercise patience while the national security

screening process is completed.  *See Vasili Rogatch v. Chertoff, Slip Copy,* 2007 WL 1160358

(D.R.I. April 17, 2007).  ("While the Court may be sympathetic to Plaintiff's frustration with the

length of time his application has been pending without action, this Court is without jurisdiction

to grant him any relief.  In short, he can do no more than be patient while he awaits an answer to

his application.")

## CONCLUSION

For the foregoing reasons, Respondents respectfully requests that the Court dismiss the

Petition.

Respectfully submitted,


___Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


___Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


___s/Sherease Louis_____
SHEREASE LOUIS
Special Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JIANPING SUN,** ) | |
| ) | |
| **Petitioner,** ) | |
| **v.** ) | **Civil Action No. 07-0504 (JDB)** |
| ) | |
| **ALBERTO GONZALES,** *et al.,* ) | |
| ) | |
| **Respondents.** ) | |
| _____ ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that service of the foregoing Motion to Dismiss was sent by the Court's

Electronic Case Filing System, this 25th day of May, 2007 to:

Mark Mancini, Esq.
Wasserman, Mancini & Chang, P.C.
1915 I Street, N.W., Suite 400
Washington, D.C. 20006
Attorney for Petitioner

                                              ___/s Sherease Louis_____
                                              SHEREASE LOUIS
                                              Special Assistant United States Attorney
                                              United States Attorney's Office
                                              Civil Division
                                              555 4th Street, N.W.,
                                              Washington, D.C. 20530
                                              (202) 307-0895

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Jianping Sun

                         Plaintiff,


v.                                          Civ. Act. Number: **1:07-CV-00504-JDB**


Department of Homeland Security, *et. al.,*

                         Defendants.


## DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind.  I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services.  TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC has 51,221 pending employment based I-485s and projects receiving another 95,000 by the end of the FY 2007. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. Once USCIS receives an I-485, a file is opened and an electronic record of that application is created.  Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests.  Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

3. Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication.  FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY.  An FBI Name Check that has been completed will be indicated by various entries depending on the result.

4. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check

request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks

5. All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

6. Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

7. The Service Centers, to increase efficiency and provide better service on immigration benefits, reorganized, in a process called bi-specialization, so that two Service Centers would specialize in certain applications and petitioners, instead of each Service Center handling all types of applications and petitions. To implement this reorganization each center transferred pending applications to other centers that specialized in that type of application. Thus, a center that instituted a process, as is the case here, is not the center that completes the process on certain pending or transition cases.

8. I have custody of the TSC records of Jianping Sun, A98364344, and I supervise TSC officers who are processing Jianping Sun's applications. After reviewing the information pertaining to Jianping Sun, I attest that USCIS has referred this case for lawfully required security screening of aliens and that USCIS suspended adjudication in accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

9. During the normal processing of this case, a national security screening was requested. The information and records pertaining to Jianping Sun shows that TSC Officers under my supervision make regular inquiries about the status of his security screening.


_____
Naboone Puripongs
Supervisory Adjudications Officer
Texas Service Center

22-May-2007
Date

1

2

3

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

4      JIANPING SUN,

5              Plaintiff,

6              v.                                    Case No:
                                                     07-cv-504
7      ALBERTO GONZALES,
           et al.,
8
               Defendants.
9

10

11              **DECLARATION OF MICHAEL A. CANNON**

12          Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

13          (1)    I am currently the Section Chief of the National Name Check Program

14      Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C.

15      I have held that position since March 7, 2005.

16          (2)    In my current capacity as Section Chief, I supervise the National Name

17      Check Units. The statements contained in this declaration are based upon my personal

18      knowledge, upon information provided to me in my official capacity, and upon conclusions and

19      determinations reached and made in accordance therewith.

20          (3)    Due to the nature of my official duties, I am familiar with the procedures

21      followed by the FBI in responding to requests for information from its files pursuant to the policy

22      and the procedures of the United States Citizenship and Immigration Services ("USCIS").

23      Specifically, I am aware of the name check request for Jianping Sun, the plaintiff in this civil

24      action.

25              **NATIONAL NAME CHECK PROGRAM**

26          (4)    The National Name Check Program ("Program") has the mission of

27      disseminating information from the FBI's Central Records System in response to requests

28      submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

1  police and intelligence agencies, and state and local criminal justice agencies. The Central

2  Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.

3  The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower

4  Administration. That executive order addresses personnel security issues and mandates National

5  Agency Checks as part of the pre-employment vetting and background investigation process for

6  prospective Government employees. The FBI performs the primary National Agency Check

7  conducted on all United States Government employees. From this modest beginning, the

8  Program has grown exponentially, with more and more customers seeking background

9  information from FBI files on individuals before bestowing a privilege, such as Government

10  employment or an appointment, a security clearance, attendance at a White House function, a

11  "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and

12  local agencies regularly request FBI name searches. In addition to serving our regular

13  Government customers, the FBI conducts numerous name searches in direct support of the FBI's

14  counterintelligence, counterterrorism, and homeland security efforts.

15  <u>**EXPLANATION OF THE CENTRAL RECORDS SYSTEM**</u>

16       (5)    The FBI's CRS enables the FBI to maintain all information which it has

17  acquired in the course of fulfilling mandated law enforcement responsibilities. The records

18  maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

19  compiled for law enforcement purposes. This system consists of a numerical sequence of files

20  broken down according to subject matter. The subject matter of a file may relate to an

21  individual, organization, company, publication, activity, or foreign intelligence matter. Certain

22  records in the system are maintained at FBI Headquarters. Records which are pertinent to

23  specific FBI Field Offices are mostly maintained at those Field Offices.

24       (6)    FBI Headquarters and each Field Division can access the CRS through the

25  FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

26  indices on various subjects, including the names of individuals and organizations. Only the

27  information considered pertinent, relevant, or essential for future retrieval is indexed.

28

2

1        (7)     Communications directed to FBI Headquarters from various Field Offices

2  and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

3  groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

4  victims. Searches made in the index to locate records concerning particular subjects are made by

5  searching the name of the subject requested in the index.

6        (8)     The entries in the General Indices fall into two categories:

7             (a)   "main" entries – entries that carry the name corresponding
                     with the subject of a file contained in the CRS.

8

             (b)   "reference" entries – entries (sometimes called "cross-
9                     references") that generally only mention or reference an
                     individual, organization, etc., that is contained in a
10                   document located in another "main" file.

11        (9)     In 1995, the FBI implemented the Automated Case Support ("ACS")

12  system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records

13  were converted from automated systems previously utilized by the FBI. The ACS system

14  consists of the following three automated applications that support case management functions

15  for all investigative and administrative cases:

16             (a)   Investigative Case Management: This application provides
17                     the ability to open, assign, and close investigative and
                     administrative cases as well as to set, assign, and track
18                   leads. A case is opened by the Office of Origin, which sets
                     leads for itself and other field offices, as needed. The
19                   offices that receive the leads are referred to as Lead Offices.
                     When a case is opened, it is assigned a Universal Case File
20                   Number, which is utilized by FBI Headquarters and all
                     offices conducting or assisting in the investigation. Using
21                   fictitious file number "111-HQ-12345" as an example, an
                     explanation of the Universal Case File Number is as
22                   follows: "111" indicates the classification for that specific
                     type of investigation; "HQ" is the abbreviated form used for
23                   the Office of Origin of the investigation (in this case, FBI
                     Headquarters); and "12345" indicates the individual case
                     file number for that particular investigation.
24

25             (b)   Electronic Case File: This application serves as the central
                     electronic repository for the FBI's official text-based
26                   documents. It supports the universal serial concept, where
                     only the creator of a document serializes it into a file,
27                   providing single source entry of serials into the

28

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)  Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.4 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)   When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

1   reasons to explain why an FBI Special Agent conducting an investigation believed it important to

2   include a particular name in the FBI's index for later recovery. The names are searched in a

3   multitude of combinations, switching the order of first, last, and middle names, as well as

4   combinations with only the first and last names, first and middle names, and so on. The Program

5   application searches names phonetically against the Universal Index records and retrieves similar

6   spelling variations (which is especially important considering that many names in our indices

7   have been transliterated from a language other than English).

8           (12)    If there is a match with a name in a FBI record, it is designated as a "Hit,"

9   meaning that the system has stopped on a possible match with the name being checked. If a

10  search comes up with a match to a name and either a birth date or social security number, it is

11  designated an "Ident."

12                              **RESOLUTION RATE**

13          (13)    Historically, approximately 68 percent of the name checks submitted by

14  USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72

15  hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable

16  information regarding a particular individual. Duplicate submissions (i.e., identically spelled

17  names with identical dates of birth and other identical information submitted while the original

18  submission is still pending) are not checked, and the duplicate findings are returned to USCIS

19  within 48-72 hours.

20          (14)    For the name check requests that are still pending after the initial

21  electronic check, additional review is required. A secondary manual name search completed

22  typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests

23  as having "No Record," for a 90 percent overall "No Record" response rate. The results of this

24  22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being

25  the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the

26  record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can

27  be reviewed quickly. If not, however, the relevant information must be retrieved from an

28                                      5

1   existing paper record. Review of this information will determine whether the information is

2   identified with the request. If the information is not identified with the request, the request is

3   closed as a "No Record" and USCIS is so notified.

4         (15)   Once a record is retrieved, the FBI reviews the file for possible derogatory

5   information. Less than one percent of USCIS's requests are identified with a file containing

6   possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory

7   information to USCIS.

8                 **GROWTH OF THE NAME CHECK PROGRAM**

9         (16)   Prior to September 11, 2001, the FBI processed approximately 2.5 million

10  name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the

11  number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4

12  million name checks.

13                **USCIS NAME CHECK REQUESTS**

14        (17)   In November 2002, heightened national security concerns prompted a

15  review of the former Immigration and Naturalization Service's ("INS's") procedures for

16  investigating the backgrounds of individuals seeking immigration benefits. It was determined

17  that deeper, more detailed clearance procedures were required to protect the people and the

18  interests of the United States effectively. One of the procedures identified was the FBI's name

19  check clearance. Before November 2002, only those "main" files that could be positively

20  identified with an individual were considered responsive to the immigration authorities name

21  check requests. However, because that approach ran a risk of missing a match to a possible

22  derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a

23  processing standpoint, this meant the FBI was required to review many more files in response to

24  each individual background check request.

25        (18)   In December of 2002 and January of 2003, the former INS resubmitted 2.7

26  million name check requests to the FBI for background investigations of all individuals with

27  then-pending applications for immigrations benefits for which the Immigration and Nationality

28

1  Act required background investigations. Those 2.7 million requests were in addition to the

2  regular submissions by the former INS. Currently, the FBI has returned an initial response to all

3  2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

4  those resubmitted requests indicated that the FBI had no information relating to the specific

5  individual who was the subject of the request, approximately 16 percent – or over 440,000 –

6  resubmitted requests indicated that the FBI may have information relating to the subject of the

7  inquiry. The FBI is still in the process of resolving those 440,000 requests.

8         (19)   The FBI's processing of those 440,000 resubmissions has delayed the

9  processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name

10  check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check

11  be expedited.

12         (20)   The FBI cannot provide a specific or general time frame for completing

13  any particular name check submitted by USCIS. The processing of name checks, including those

14  which are expedited, depends upon a number of factors, including where in the processing queue

15  the name check lies; the workload of the analyst processing the name check; the volume of

16  priority checks the analyst must process for, among others, military call-ups, medical

17  emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible

18  matches) that must be retrieved, reviewed and resolved; the number of records from various Field

19  Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and

20  resources available to conduct the checks. While the FBI is sensitive to the impact of the delays

21  in processing name check requests, the consequence of the FBI's mission on homeland security

22  requires that its name check process be primarily focused on providing accurate and thorough

23  results. When the name check is completed, the FBI provides the results to USCIS as quickly as

24  possible.

25         (21)   It is important to note that the FBI does not adjudicate applications for

26  benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a

27  summary of available information to USCIS for its adjudication process.

28

7

1                    <u>**PLAINTIFF'S NAME CHECK REQUEST**</u>

2              (22)    The name check request for plaintiff Jianping Sun was received by the FBI

3    from USCIS on or about May 18, 2004, and has not been completed.  The FBI is performing its

4    check in response to USCIS's request in accordance with procedures outlined above.  The results

5    of the name check will be forwarded to USCIS in Washington, D.C., in due course, in

6    accordance with the FBI's normal protocol.

7              (23)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

8    foregoing is true and correct to the best of my knowledge and belief.

9         Executed this **24th** day of May 2007.

10

11

12    MICHAEL A. CANNON
      Section Chief
13    National Name Check Program Section
      Records Management Division
14    Federal Bureau of Investigation
      Washington, D.C.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        8

*Press Office*
**U.S. Department of Homeland Security**



# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns.  USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States.  Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit.  Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement.  Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS.  Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JIANPING SUN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| v. | ) | **Civil Action No. 07-0504 (JDB)** |
| | ) | |
| **ALBERTO GONZALES,** *et al.,* | ) | |
| | ) | |
| **Respondents.** | ) | |
| | ) | |

UPON CONSIDERATION of the ***Defendant's Motion to Dismiss and Supporting***

***Memorandum of Points and Authorities,*** any Opposition filed thereto, and the entire record

herein, for good cause shown, it is by the Court,

ORDERED that the Defendant's motion should be and is hereby granted.

SO ORDERED.

_____          _____
DATE                                             JOHN D. BATES
                                                      UNITED STATES DISTRICT COURT JUDGE